# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

FRANKLIN D. AZAR & ASSOCIATES, P.C.,

        Plaintiff,

      v.                             No. 1:17-cv-00869-JAP-SCY

KEVIN EGAN,

        Defendant.

## KEVIN EGAN'S MOTION FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56, Defendant Kevin Egan moves the Court for summary judgment and dismissal with prejudice of Plaintiff Franklin D. Azar & Associates, P.C.'s ("Azar") claims for intentional interference with contract and prima facie tort. Pursuant to D.N.M.LR-Civ. 7.1(a), Defendant's counsel conferred in good faith with Plaintiff's counsel and determined that Plaintiff opposes this Motion.

## BACKGROUND

Azar originally represented Fidencio and Veronica Loya (the "Loyas") in a personal injury case. In 2008, Mr. Loya suffered severe injuries while working at an oilfield in southern New Mexico when a casing elevator malfunctioned and an 800-pound piece of casing fell on him. Thus, decisions about the pursuit of remedies and Mr. Loya's medical care fell on the shoulders of Ms. Loya. Ms. Loya retained Azar in 2010 to represent Ms. Loya and her family regarding claims arising out of the Mr. Loya's injuries.

Mr. Egan is a family friend of the Loyas who provided assistance and advice to Ms. Loya in connection with her decision to find replacement counsel to prosecute the personal injury matter. In this lawsuit, Azar alleges that Mr. Egan intentionally and wrongfully interfered in its

contingency fee contract with the Loyas.   Azar contends that Mr. Egan caused Ms. Loya to terminate Azar and to hire a new set of attorneys, who then settled the Loyas' case for a substantial sum of money.

Mr. Egan became involved with Ms. Loya and her family assisting them in issues related to the litigation.  With Mr. Egan's advice, Ms. Loya eventually decided to terminate Azar and to hire replacement counsel. Replacement counsel brought the personal injury suit to a successful conclusion through settlement.  Evidence relevant to the disposition of the instant action was developed during an attorney's lien dispute and proceeding brought by Azar against the replacement firm to resolve the  allocation of attorneys' fees earned in the personal injury case (the "Fee Allocation Proceeding").  Depositions were taken, and other evidence was offered, in the Fee Allocation Proceeding.  Ultimately the matter was resolved through an arbitration.

Unsatisfied and undeterred, Azar now brings this lawsuit against Mr. Egan, claiming that Mr. Egan "induced the Loyas to breach their contract" with Azar and that Mr. Egan persuaded the Loyas to change counsel in order to harm Azar.  (Complaint & Jury Demand of Franklin D. Azar & Assocs., P.C. ("Complaint") ¶ 23.) Azar asserts that by giving advice and assistance to a family friend, Mr. Egan intentionally interfered with Azar's contract with the Loyas and that Mr. Egan owes Azar the difference between the total attorneys' fees paid as a result of settlement of the personal injury action and the reasonable fees paid to Azar.  Count I of the Complaint alleges intentional interference with contract. (*Id.* ¶¶ 18-23.) Count II alleges prima facie tort. (*Id.* ¶¶ 24-29.)

Azar's responses to initial discovery in this action, as well as the evidence adduced in the Fee Allocation Proceeding, demonstrate that Azar cannot come forward with evidence that-will

allow his claims to survive summary judgment.  The facts Azar points to in support of its claims are more consistent with Mr. Egan having permissible motivations than with a sole motivation to harm Azar.  At best, Azar has asserted a species of "negligent inquiry" liability with respect to the basis of Mr. Egan's assistance to Ms. Loya.  As a matter of law, there is no such sub-species of an intentional interference claim.  Thus, Mr. Egan is entitled to summary judgment.

The undisputed material facts do not show that Mr. Egan's motive was to harm Azar or that he used wrongful means to help Ms. Loya discharge Azar and secure new counsel.  The material facts show that Mr. Egan had legitimate personal reasons for helping Ms. Loya, which included helping her find new counsel.  Moreover, it is undisputed that Mr. Egan received no pecuniary or other material benefit as a result of Ms. Loyas' termination of Azar.  Under New Mexico law, Ms. Loya had an unfettered right to terminate Azar at any time, including without cause. Rule 16-116 NMRA. There is simply no recognized cause of action against someone such as Mr. Egan who gives advice and support to a family friend to terminate one attorney's representation and seek new legal counsel.  New Mexico public policy does not – and should not – support such a radical proposition because the attorney-client relationship is "a relationship which ethically is and must be terminable at the discretion of the client." *Guest v. Allstate Ins. Co.*, 2010-NMSC-047, ¶ 2, 149 N.M. 74, 244 P.3d 342.  To allow the allegations in Azar's Complaint to move forward would chill a client's ability to seek advice from friends and family regarding the difficult decisions inherent in retaining and keeping counsel of his or her own choosing, which would especially harm the less sophisticated and more vulnerable.

Finally, Azar cannot come forward with evidence supporting causation.  The undisputed material facts reveal that Mr. Egan was not the proximate cause of Azar's claimed injuries because there is no evidence showing that without Mr. Egan's involvement, Ms. Loya would not

have terminated her attorney-client relationship with Azar.  Such an allegation is speculative, unfounded, and cannot survive summary judgment.  Azar's claims are baseless and the Court should dismiss this lawsuit in its entirety, with prejudice.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

As required by D.N.M.LR-Civ. 56.1(b), Mr. Egan sets out the following statement of undisputed material facts:

1.      Kevin Egan has known Veronica Loya since approximately 2004, when she began working as a housekeeper for Mr. Egan and his wife.  Egan Dep., relevant portions attached as Ex. A, at 31:11-20; Loya Dep., relevant portions attached as Ex. B, at 32:19-23.[1]

2.      Mr. and Mrs. Egan are also friends with Reynaldo and Martha Silva, Ms. Loya's parents.  Mr. Egan employed Mr. Silva for approximately 15 years to perform household tasks at the Egans' home in Santa Fe, New Mexico.  Egan Dep. at 30:1-9; 32:4-11.

3.      Mr. Egan considers himself to be a family friend and advisor to Ms. Loya and her family.  *Id.* at 35:16-17; Pl.'s Resp. Def.'s First Req. Admission, Req. Nos. 8, 11, attached as Ex. C.

4.      Likewise, Ms. Loya considers Mr. Egan to be a family friend.  Loya Dep. at 31:9-13.

5.      On October 8, 2008, Ms. Loya's husband Fidencio Loya was severely injured while working at an oil production site when a casing elevator malfunctioned and an 800-pound casing unit fell on his head. (Compl. ¶ 7.)

6.      In December of 2010, Ms. Loya retained Azar to represent the Loya family on a contingent fee basis in the matter of *Loya v. OGS Operating, Inc.*, No. D-101-CV-2011-01028,

---

[1] In the underlying Fee Allocation Proceeding, numerous depositions were taken, including those of Ms. Loya and Mr. Egan.  During discovery in this matter, Azar produced copies of those deposition transcripts.  Mr. Egan therefore relies upon those deposition transcripts for the purposes of this Motion.

which was filed on March 24, 2011 in the First Judicial Court, County of Santa Fe, New Mexico

("State Action").  Azar filed an Amended Complaint on October 7, 2011.  (Compl. ¶¶ 9-10.)

7.      The State Action was handled for Azar primarily by attorneys Daniel Buttram, Jane Rowe, and Franklin Azar. Pl.'s Resps. Def.'s First Interrgs., Interrog. No. 3, attached as Ex. D.

8.      Mr. Egan contacted Mr. Buttram to inquire about the status of the Loyas' case. Egan Dep. at 37:4-38:3.  Specifically, it was Mr. Egan's recollection of this conversation with Mr. Buttram that the case did not seem to be developing and there was a lack of money available for discovery. *Id.* Mr. Egan also felt that Azar's cost estimate of $20,000 was too low given the need for experts. *Id.* at 38:19-25; 56:18-25.

9.      Following his conversation with Mr. Buttram, Mr. Egan's impression was that Mr. Buttram was frustrated with the lack of funding available for the Loyas' case.  Mr. Egan thought that Mr. Buttram was contemplating leaving the firm.  *Id.* at 49:16-18; 188:5-8; 191:20-25.

10.      Ms. Loya grew concerned with Azar's representation of her and her family.  She felt that the matter had "taken too long and nothing had been resolved." Loya Dep. at 96:13-15.

11.       Mr. Egan also felt that there was poor communication between Azar and Ms. Loya regarding the status of the case. Egan Dep. at 94:17-19.

12.      In May 2012 Mr. Buttram announced that he was leaving Azar.  Around that time, Ms. Loya began to want to find new legal representation.  Loya Dep. at 86:11-25.  Specifically, she began to feel "unsafe" after Mr. Buttram left Azar because he was the attorney working on her case with whom she was most familiar. *Id.* at 86:19-22.

13.     Ms. Loya understood that under New Mexico law she had the right to find a new attorney if she so desired.  *Id.* at 86:16-19.

14.     During Azar's representation of the Loyas, their conduct was governed by the New Mexico Rules of Professional Conduct.  Azar admits that a client such as Ms. Loya has the right to discharge her counsel at any time, with or without cause. Pl.'s Resp. Def.'s First Req. Admission, Req. Nos. 1-3.

15.     Ms. Loya mentioned to Kate Eaton, one of the attorneys working on her husband's worker's compensation matter, that she was not happy with Azar and needed another lawyer.  Ms. Eaton recommended her father-in-law, Roger Eaton.  Loya Dep. at 124:24-125:3; 147:12-148:18.

16.     Mr. Egan ultimately became interested in ensuring the Loyas' interests were protected by improving their litigation counsel.  Egan Dep. at 58:5-20.

17.     In May of 2012, Mr. Egan felt that the time was right to help Ms. Loya retain new counsel in light of Mr. Buttram's decision to leave Azar.  *Id.* at 75:13-17; 88:14-23.

18.     With her permission, Mr. Egan helped Ms. Loya find referrals for other attorneys. Loya Dep. at 137:17-21; 154:25-155:3.

19.     Mr. Egan's goal was to help get the Loyas in "good hands." Egan Dep. at 203:2-9. He felt that he could not "in good conscience recommend" to Ms. Loya that she "spend one more minute with anybody from Azar."  *Id.* at 207:20-25.

20.     Mr. Egan recommended Roger Eaton and David Houliston given their experience in medical and personal injury matters as well as their trial experience.  *Id.* at 92:25-94:11.

21.     Thereafter, on June 22, 2012, Ms. Loya signed a contingency fee agreement with Mr. Eaton and Mr. Houliston.  (Compl. ¶ 13.)

22.     It was Ms. Loya's decision to hire Mr. Eaton and Mr. Houliston and to terminate her attorney-client relationship with Plaintiff.  Loya Dep. at 98:24-99:2; 153:24-154:2.

23.     Mr. Eaton and Mr. Houliston represented the Loyas through full resolution of the State Action. Azar then brought the Fee Allocation Proceeding against Mr. Eaton and Mr. Houliston to recover the reasonable value of Azar's services. Pl.'s Resps. Def.'s First Interrgs., Interrog. No. 11; Pl.'s Resp. Def.'s First Req. Admission, Req. No. 5.

24.     Azar settled the Fee Allocation Proceeding. *Id.* at Req. Nos. 5-7.

25.     Azar recovered reasonable fees and expenses in the Fee Allocation Proceeding. *Id.*

26.     Mr. Egan received no financial or other pecuniary gain or benefit as a result of the State Action.  *Id.* at Req. No. 12.

## LEGAL STANDARD

Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant bears the initial burden of showing that the motion satisfies this standard.  *Libertarian Party v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  Where – as in the present case – the nonmovant bears the burden at trial, the party moving for summary judgment can discharge its initial burden "either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Trainor v. Apollo Metal Specialties*, *Inc.*, 318 F.3d 976, 979 (10th Cir. 2002); *see Celotex*, 477 U.S. at 325.

Once the movant meets this burden, the party opposing a summary judgment motion "may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (internal quotation marks & citation omitted).  It is not enough for the party opposing summary judgment to "rest upon mere allegations or denials of his [or her] pleading." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  The nonmoving party "cannot rest on ignorance of [the] facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988)).  Nor can the party opposing summary judgment "satisfy her rebuttal burden under Rule 56 by relying upon conclusory allegations, improbable inferences, and unsupported speculation." *Laurin v. Providence Hosp.*, 150 F.3d 52, 59 (1st Cir. 1998) (internal quotation marks & citation omitted).

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).  For this reason, a plaintiff "cannot avoid summary judgment merely by presenting a scintilla of evidence to support her claim; she must proffer facts such that a reasonable jury could find in her favor." *Turner v. Public Serv. Co.*, 563 F.3d 1136, 1142 (10th Cir. 2009); *see Smith v. Rail Link, Inc.*, 697 F.3d 1304, 1309 n. 2 (10th Cir. 2012) ("A mere scintilla of evidence will not suffice to allow a nonmoving party to survive summary judgment.").

I.      **Mr. Egan is entitled to summary judgment on Azar's claim for intentional interference with Azar's contingency fee agreement.**

Mr. Egan is entitled to summary judgment on Count I of the Complaint because there is no evidence that Mr. Egan acted with either an improper motive to harm Azar or that he used improper means in giving advice to Ms. Loya to help her retain new counsel.  "Establishing tortious interference with contract is not easy." *Ettenson v. Burke*, 2001-NMCA-003, ¶ 14, 130 N.M. 67, 17 P.3d 440. "In order to prove intentional interference with a contract, a plaintiff must establish that the defendant, without justification or privilege to do so, induces a third person not to perform a contract with another." *Deflon v. Sawyers*, 2006-NMSC-025, ¶ 16, 139 N.M. 637, 137 P.3d 577 (internal quotation marks & citation omitted).  Intentional interference with an existing contractual relationship and interference with a prospective contractual relationship are two separate claims under New Mexico law.  Existing contractual relationships merit more protection than prospective contractual relationships, and thus, a different analysis is appropriate for the two claims. *Fikes v. Furst*, 2003-NMSC-033, ¶ 22, 134 N.M. 602, 81 P.3d 545.  An at-will contract like an attorney-client contract is treated like a prospective contract.  *Id.* ¶ 21; *see also Nostrame v. Santiago*, 61 A.3d 893, 900 (N.J. 2013) (Because the contract between an attorney and client is terminable at-will, interference with it must be analyzed in accordance with the principles governing interference with a prospective contractual relationship.).

A.      **Azar has no evidence in support of a claim for intentional interference with a terminable at-will contract.**

To prevail on a claim for intentional interference with a contract that is terminable at-will, a plaintiff must establish that the defendant's sole motive was to harm the plaintiff or that the defendant used an improper means. *Zarr v. Washington Tru Solutions, L.L.C.*, 2009-NMCA-050, ¶¶ 17, 23, 146 N.M. 274, 208 P.3d 919. Under New Mexico law, courts will apply the

means and motive analysis applicable to prospective contracts to an at-will contract. *Fikes*, 2003-NMSC-033, ¶ 21 (citing *Kelly v. St. Vincent Hosp.*, 1984-NMCA-130, 102 N.M. 201, 692 P.2d 1350).  The attorney-client contract between Azar and Ms. Loya was terminable at-will. *Guest*, 2010-NMSC-047, ¶ 46; Rule 16-116 comm. commentary 4 ("A client has a right to discharge a lawyer at any time, with or without cause, subject to liability for payment for the lawyer's services.").  Therefore, to sustain a claim for intentional interference with contract, Azar must proffer evidence that Mr. Egan's sole motive was to harm Azar or that Mr. Egan used improper means in giving advice to Ms. Loya that helped her find replacement counsel.  Azar cannot do so, thus Mr. Egan is entitled to summary judgment.

### 1.    Azar has no evidence of improper motive.

Azar has no evidence that Mr. Egan's sole motive was to harm Azar.  "[W]here a defendant is accused of interfering with a plaintiff's opportunity to enter into prospective contracts, a strong showing must be made that the defendant acted not for legitimate business reasons but from some motive such as personal vengeance or spite." *Zarr*, 2009-NMCA-050, ¶ 25. "If the accused can show a legitimate business reason for the action, even if there also may have been a motive to harm the plaintiff, no material issue of fact exists."  *Id.*

In *M & M Rental Tools, Inc. v. Milchem, Inc.*, 1980-NMCA-072, ¶ 1, 94 N.M. 449, 612 P.2d 241, the court concluded that "[d]efendants cannot be held liable on the basis of improper motive; the evidence is uncontradicted that [defendants'] motive was not solely to harm plaintiff." *Id.* ¶ 27.  Therefore, even if the defendant had wanted to interfere with the plaintiff's contract *and* had a proper reason for doing so, he could not be liable for the interference because he had a legitimate business reason for the interference. *See id.*

Likewise, in *Kelly* a physician argued that his hospital-employer intentionally interfered with his contractual relations with his patients when the hospital adopted a malpractice insurance requirement and refused to exempt him from the requirement, which led to a decision not to renew his contract.  *See* 1984-NMCA-130, ¶ 24.  The court first concluded that the contracts between the physician and his patients were contracts at-will, so the court applied the test requiring sole motive to harm the plaintiff.  The court held that summary judgment in favor of the defendant was proper because the undisputed material facts showed that even if the hospital had some improper motive, "it was not the sole motive."  *Id.* ¶ 31. The hospital's motive was at least in part proper because there was evidence that the hospital's decision not to exempt the physician from the insurance requirement "was a legitimate business purpose."  *Id.*

Similarly here, "the record is replete with evidence that" Mr. Egan had legitimate purposes for helping Ms. Loya change counsel, even assuming for the sake of argument that Mr. Egan also had a motive to harm Azar, which Mr. Egan disputes.  *Id.* ¶ 28.  Therefore, there is no material issue of fact as to Mr. Egan's motive, and summary judgment in Mr. Egan's favor is proper.  It is undisputed that Mr. Egan was a family friend and advisor to Ms. Loya, and he wanted to ensure she was in "good hands."  Statement of Undisputed Material Facts ("UMF") ¶¶ 1-4, 11, 16, 17, 19, 20.  Mr. Egan was worried about Mr. Buttram leaving Azar and he felt that little had been done to advance the Loyas' case.  *Id.* ¶¶ 9, 17. Even if he did have some sense of dislike for Azar based on Azar's advertising practices, it is immaterial because the undisputed facts show that Mr. Egan wanted to ensure the Loyas had effective legal representation so he helped Ms. Loya retain new attorneys.  *Id.* ¶¶ 8-11, 16-19.

Indeed, each of Azar's assertions fails to properly allege a claim for tortious interference, let alone survive summary judgment.  Azar claims that Mr. Egan intended to harm Azar because

Mr. Egan had distaste for billboard attorneys, did not like Azar's advertisements, did not ask sufficient questions before advising Ms. Loya to change counsel, felt that Mr. Buttram was frustrated with the lack of progress on the case, and felt that Azar was not capable of handling the case. Azar contends that the statements Mr. Egan "made concerning Azar's handling of the Loyas' case and capacity to pursue the litigation were false." (Compl. ¶ 14.) According to Azar, the basis for this allegation is that Mr. Egan "claims he got the impression that Daniel Buttram was frustrated with the lack of progress on the case in light of there not being adequate resources available." Pl.'s Resps. Def.'s First Interrgs., Interrog. No. 8.   Azar's purported evidence in support of this contention is that Mr. Egan "did not inquire" as to whether Azar "could fund greater expenses in pursuit of the case."   *Id.* Further, Azar points to Mr. Egan's sentiment that when Mr. Buttram left Azar, it would be a good time to move the Loyas' case to new counsel and alleges that this constitutes wrongful interference with the contingency fee agreement.   *See id.*

Azar further asserts that in allegedly persuading the Loyas to change counsel, Mr. Egan knew or should have known that his statements to Ms. Loya were false.  (Compl. ¶ 15.)  Azar's claimed evidentiary support is the statement that Mr. Egan allegedly told Ms. Loya that Azar was not financially capable of funding the costs, had not retained experts, and the work was progressing slowly.  Pl.'s Resps. Def.'s First Interrgs., Interrog. No. 9. Azar also "believes" that Mr. Egan characterized Azar "and Mr. Azar personally in intentionally derogatory terms as a 'billboard attorney' who are out to get slip-and-fall cases, they are 'business hustlers' who try to get cases and then try to settle them."   *Id.* Azar also "believes that Mr. Egan claimed that Mr. Azar was not a 'real PI attorney.'"   *Id.* As a simple matter of law, Mr. Egan's characterizations

and personal beliefs about Azar do not rise to the level of improper interference with Azar's contingency fee agreement.

Furthermore, the basis of Azar's claim that Mr. Egan improperly persuaded the Loyas to change counsel in the State Action is that "Mr. Egan formed a distaste for [Azar] after learning that [Azar] advertised on billboards, and he was not happy that the Loyas were being represented by someone whose advertising practices he disapproved." Pl.'s Resps. Def.'s First Interrgs., Interrog. No. 5.  Azar states that Mr. Egan did not ask the appropriate questions of Mr. Buttram "that would have been important to a reasonable person whose honest goal was to ascertain the status of litigation, progress on the case, or the sustainability of [Azar] as counsel." *Id.* Again, whether Mr. Egan had "distaste" for Azar, and whether Mr. Egan did not approve of Azar's advertisements, does not establish improper interference with Azar's contingency agreement as a matter of law.

In support of Azar's claim that Mr. Egan intended to harm Azar, Azar cites to the following purported evidence:  "Mr. Egan's attitude toward [Azar] appeared to have been based solely on his belief that attorneys who advertise on billboards are disreputable, or at least that [Azar's] advertisements were offensive. Pl.'s Resps. Def.'s First Interrgs., Interrog. No. 7.  Azar also points out that Mr. Egan allegedly declined to meet with Azar attorneys before a termination decision was made, and "made virtually no effort to secure material, detailed information concerning the actual state of [Azar's] work on behalf of the Loyas." *Id.*

As a matter of law, each of the above "facts" and contentions fail to show that Mr. Egan had a sole motive to harm Azar.  Whether Mr. Egan was negligent in his assessment of Azar's abilities and advertising practices is immaterial to whether Mr. Egan intended to interfere with Azar's at-will contingency fee contract.  Moreover, whether Azar "believes" that Mr. Egan

characterized Azar as a "billboard attorney" or a "business hustler" does not present any genuine issue of fact for summary judgment purposes. *See Argo v. Blue Cross and Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1200 (10th Cir. 2006) (at summary judgment, statements of mere belief must be disregarded).

Mr. Egan's undisputed desire to ensure the Loyas were in good hands and to advise Ms. Loya in replacing Azar does not rise to the level of a *sole* motive to harm Azar. *See Kelly*, 1984-NMCA-130, ¶ 28. Even if Mr. Egan disliked Azar's advertising or felt that Azar was ill-equipped to handle the Loyas' litigation, it is immaterial because dislike is not the same as a motive and intent to harm under New Mexico law. *See id.; see also Zarr*, 2009-NMCA-050, ¶ 25 ("If the accused can show a legitimate business reason for the action, even if there also may have been a motive to harm the plaintiff, no material issue of fact exists.").

### 2.   Azar has no evidence of improper means.

When a plaintiff cannot establish that the defendant's sole motive was to harm the plaintiff, it may show the defendant intentionally interfered with a prospective contract by improper means, which can include "predatory behavior, violence, threats or intimidation, deceit or misrepresentation, bribery, economic pressure, unfounded litigation, defamation, unlawful conduct, and perhaps violation of business ethics and customs." *Id.* ¶ 11 (citing *M & M Rental Tools*, 1980-NMCA-072, ¶ 29; *Restatement (Second) of Torts* § 767 cmt. c (1979)).

In *M & M Rental Tools*, the court of appeals held that the plaintiff could not succeed under the improper means theory because its interference was not "predatory." 1980-NMCA-072, ¶ 28. The court differentiated competitive means from improper means, holding that predatory means are not the same as beating "a business rival to prospective customers." *Id.* (internal quotation marks & citation omitted). Furthermore, the plaintiff had not used any means

such as violence, intimidation, or defamation, and "inasmuch as the parties were competitors," the defendant had not used improper means under the circumstances. *Id.* ¶¶ 29-30. Therefore, the defendant's means were a "legal competitive right and not an improper interference" on the plaintiff's business. *Id.* ¶ 10; *see also Kelly*, 1984-NMCA-130, ¶ 30 (Defendant's means were proper because it had not acted in an "innately wrongful or predatory" character.).

Here, Azar cannot show that Mr. Egan used any improper means in his dealings with Ms. Loya. There is no evidence that Mr. Egan engaged in "predatory behavior, violence, threats or intimidation, deceit or misrepresentation, bribery, economic pressure, unfounded litigation, defamation, unlawful conduct, [or] violation of business ethics and customs." *Zarr*, ¶ 11. Even if Azar believes that Mr. Egan characterized Azar as a "billboard attorney" out to get slip-and fall cases, such does not rise to the level of improper means because Azar has not shown that this characterization was made to Ms. Loya and was the cause of Ms. Loya's decision to terminate Azar. Likewise, even if it was true that Mr. Egan did not ask enough questions of Azar before recommending the change of counsel to Ms. Loya, alleged negligent advice-giving does not constitute improper means as a matter of law.

Furthermore, there is no evidence that Mr. Egan received any financial or other benefit resulting from Ms. Loya's termination of Azar, therefore he could not have been improperly motivated to help Ms. Loya find new lawyers for an improper personal gain at Ms. Loya's expense. UMF ¶ 26. The undisputed material facts show that Mr. Egan simply did not feel that Azar was the best firm to handle Ms. Loya's needs. *Id.* ¶¶ 8-11, 16-19. Mr. Egan was concerned following his conversation with Mr. Buttram, and he felt there was inadequate communication between Azar and Ms. Loya. He saw himself in a position to help Ms. Loya find referrals for more effective counsel, and he proceeded to do just that. *See id.* Mr. Egan's undisputed

sentiment that Azar was not the best firm equipped for Ms. Loya's needs does not, as a matter of law, rise to the level of improper means.  Moreover, the fact that Mr. Egan took an active role in helping Ms. Loya find replacement counsel does not constitute improper means under New Mexico law because there is no evidence of "predatory behavior, violence, threats or intimidation, deceit or misrepresentation, bribery, economic pressure, unfounded litigation, defamation, unlawful conduct, and perhaps violation of business ethics and customs."  *Zarr*, 2009-NMCA-050, ¶ 11.  Under these circumstances, where a client has an unconstrained right to freely hire and fire counsel of her own choosing, it was not improper for Mr. Egan to help Ms. Loya hire replacement counsel. *Bogle v. Summit Inv. Co., L.L.C.*, 2005-NMCA-024, ¶ 21, 137 N.M. 80, 107 P.3d 520 ("Improper means includes not only tortious behavior, but any predatory behavior, including behavior that is wrongful based on an established standard of a trade or profession.") (internal quotation marks & citation omitted)).

### 3.   New Mexico public policy does not support a cause of action for intentional interference under the facts of this case.

The undisputed material facts show that Mr. Egan did not act with any motive to harm Azar, and Mr. Egan's conduct was justified because he was acting to help Ms. Loya and her family out of his perception that their case was complex and they might not have had the resources to navigate those complexities. UMF ¶¶ 5, 8-11, 16-20.  To hold otherwise would be to subject individuals to civil liability for helping a friend locate and retain new legal representation.  This Court should not endorse such a radical proposition which is wholly unsupported by New Mexico policy governing attorney-client relationships.

*Nostrame v. Santiago*, 61 A.3d 893 (N.J. 2013), which involved a fact pattern strikingly similar to the one here, is instructive of the policy consideration in this matter.  The Supreme Court of New Jersey held that "because the right of the client to be represented by counsel of his

or her choosing is of paramount importance, there should be no interference with a client's free choice to retain and to discharge any attorney." *Id.* at 895.   In *Nostrame*, a client retained attorney Nostrame to represent her in a medical malpractice action.   The client thereafter entered a contingency fee agreement with a replacement attorney to represent her in the action.   The client discharged Nostrame and instructed him to turn over his file to the replacement attorney. *See id.* at 896.   The client complained that Nostrame "had done nothing to further [her] case." *Id.* (internal quotation marks & citation omitted). Just like in this case, Nostrame and the replacement attorney then "engaged in litigation relating to the release of the file and plaintiff's assertion of a lien." *Id.* Thereafter, the replacement attorney settled the client's medical malpractice suit.   *See id.* at 897.   In addition to the lien he had asserted against the replacement firm, Nostrame sued the replacement attorney as well *as the client's family members* in tort for allegedly inducing the breach of Nostrame's contingent fee contract with the client. *See id.* The court rejected Nostrame's claims.   The court's decision hinged on the policy considerations "governing the attorney-client relationship and traditional concepts of tort and contract."   *Id.* at 900.   The court explained:

> [A] client is always entitled to be represented by counsel of his own choosing[,] and *an attorney may do nothing which restricts the right of the client to repose confidence in any counsel of his choice*.   Indeed, the client is free to discharge the attorney at any time, without being subject to suit for breach of contract, because the agreement between an attorney and client is a contract that is terminable at-will.

*Id.* (emphasis added) (internal quotation marks & citation omitted).   The court affirmed the lower court's dismissal of Nostrame's claim, because not only did the policy considerations weigh against a finding of intentional interference in circumstances involving an attorney-client contract, but there was no allegation the defendant used "wrongful means, such as fraud or defamation, to induce the client to discharge the original attorney." *Id.* at 898.

17

Of critical importance for this case, the court in *Nostrame* also affirmed the lower court's dismissal of the intentional interference claims against the client's daughter as "meritless," observing that "a daughter may encourage her mother to terminate a contract that is terminable at-will without being subjected to possible liability for tortious interference with contract, at least in the absence of any allegation that she used wrongful means." *Id.* (internal quotation marks & citation omitted); *see also Ross v. Woyan*, 439 N.E.2d 428, 430 (Ohio Ct. App. 1980) ("A client is free to terminate his relationship with an attorney as he chooses. Once that relationship is terminated, a third party cannot be guilty of interfering with contractual relations, although the former clients may be liable to their former attorney for breach of contract or for payment for services rendered to that point."); *Kaplan v. Heinfling*, 526 N.Y.S. 2d 73, 75 (N.Y. App. 1988) (relying on the importance of protecting the client's "unbridled prerogative of termination" holding that "[a]ny result which inhibits the exercise of this essential right is patently unsupportable").

Just like in *Nostrame*, Azar's allegations against Mr. Egan are meritless. The Court should not expand the tort of intentional interference beyond its recognized boundaries. The Court should not endorse a cause of action against a family friend for encouraging and assisting the friend to terminate an attorney-client relationship that is terminable at-will without evidence of wrongful means such as fraud, deceit, defamation, violence, threats, or other predatory behavior. Under the New Mexico Rules of Professional Conduct, a client has the right to terminate his or her attorney for any reason, even without cause, subject only to payment for the attorney's fees. New Mexico courts recognize the fundamental principal that the attorney-client relationship is "a relationship which ethically is and must be terminable at the discretion of the client." *Guest*, 2010-NMSC-047, ¶ 2. In light of these widely accepted principals concerning

18

attorney-client relationships, this Court should decline to extend the cause of action for intentional interference to the facts of this case, where it is undisputed that Mr. Egan was a family friend and advisor to Ms. Loya and he simply helped her find attorneys to replace Azar when there is incontrovertible testimony showing that Ms. Loya was unhappy with Azar. UMF ¶¶ 1-4, 10, 13, 15, 19.

      **B.**    **Azar has no evidence in support of a claim for intentional interference with an existing contract.**

Alternatively, even if the Court declined to treat Azar's terminable at-will contract with Ms. Loya as a prospective contract, Mr. Egan is nonetheless entitled to summary judgment because Mr. Egan's conduct was justified and Azar cannot establish causation.  There are five elements a plaintiff must establish to prevail under a claim for tortious interference with existing contract:

> (1) Defendants had knowledge of the contract; (2) Plaintiff was unable to fulfill her contract obligations; (3) Defendants played an active and substantial part in causing Plaintiff to lose the benefits of the contract; (4) Plaintiff suffered damages resulting from the breach; and (5) Defendants induced the breach without justification or privilege to do so.

*Deflon*, 2006-NMSC-025, ¶ 16 (citing *Ettenson*, 2001-NMCA-003, ¶ 14); *see also Lenscrafters, Inc. v. Kehoe*, 2012-NMSC-020, ¶ 39, 282 P.3d 758. "Not every interference leading to a breach of contract amounts to an unlawful act or a civil action; *tort liability attaches only when the interference is without justification or privilege.*" *Ettenson*, 2001-NMCA-003, ¶ 14 (quotation marks & citation omitted) (emphasis added). As to the "justification or privilege" element, the plaintiff must show that the defendant acted with either "an improper motive or by use of improper means." *Id.*

The improper means factor is limited, and "includes not only tortious behavior, but any predatory behavior, including behavior that is wrongful based on an established standard of a

trade or profession." *Bogle*, 2005-NMCA-024, ¶ 21 (internal quotation marks & citation omitted). The defendant's improper "means must be used in persuading the person to breach the contract, 'but the improper motive need not be the sole motive.' If the defendant interfered in some way with the plaintiff's contract," the ultimate inquiry concerns the defendant's primary motivation for the interference.  If it was primarily improper, the defendant has no privilege.  If it was primarily proper, then liability should not attach." *Martin v. Franklin Capital Corp.*, 2008-NMCA-152, ¶ 7, 145 N.M. 179, 195 P.3d 24 (citing *Fikes*, 2003-NMSC-033, ¶¶ 20, 22-23) (alteration omitted).

There is no evidence in this case that Mr. Egan employed either an improper motive or improper means in helping Ms. Loya locate and retain new attorneys.  As established above, even if Mr. Egan felt that Azar was not the best firm equipped to handle Ms. Loya's case, this fact is not sufficient to show that Mr. Egan had an improper motive to harm Azar.  Even if Mr. Egan had some personal dislike for Azar, his feelings about Azar are immaterial because the undisputed facts show that he wanted to help Ms. Loya find capable and zealous attorneys who were competent to litigate Ms. Loya's case. UMF ¶ 19.  It does not matter that Mr. Egan might not have liked Azar, because it is undisputed that he was a longtime family friend of Ms. Loya's and that he saw himself in a position to help her. *Id.* ¶¶ 1-5, 19. As such, it is undisputed that Mr. Egan's motive was primarily proper, thus he cannot be liable for intentional interference with Azar's contingency fee agreement.

Similarly, the undisputed evidence shows that Mr. Egan did not employ any improper means.  Under New Mexico law, improper means includes wrongful and malicious conduct such as "violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood." *M & M Rental Tools*, 1980-NMCA-072, ¶ 29

20

(internal quotation marks & citation omitted); *see also Marks v. Struble*, 347 F. Supp. 2d 136, 147 (D.N.J. 2004) ("A defendant is liable for inducing a client to breach a retainer agreement only when the defendant engages in improper, wrongful misconduct, *i.e.,* makes fraudulent representations or threats or engages in other unfair, unlawful actions."). As established above, there is no evidence in this case that Mr. Egan engaged in "violence, threats, intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood." *M & M Rental Tools*, 1980-NMCA-072, ¶ 29. Even if Mr. Egan felt that Azar was not the best law firm to represent Ms. Loya and her family and even if Mr. Egan shared those sentiments with others, his primary reason for doing so was to ensure Ms. Loya was in capable hands and receiving quality representation.   UMF ¶ 19. Under New Mexico law this does not rise to the level of improper means.

Finally, Azar has no evidence of causation.  Azar cannot proffer any evidence showing that Ms. Loya would not have terminated the attorney-client relationship without Mr. Egan's involvement. Because Azar cannot meet the causation requirement, Mr. Egan is entitled to summary judgment.   *See Celotex*, 477 U.S. at 325. To prevail, Azar must show that its contingency fee contract with Ms. Loya would have actually been performed had it not been for Mr. Egan's actions *and* that Mr. Egan's allegedly tortious actions were the proximate cause of the breach. *See Wolf v. Perry*, 1959-NMSC-044, ¶¶ 22, 30, 65 N.M. 457, 339 P.2d 679.  In *Wolf*, the evidence did not show that the defendant's behavior was the sole cause of the purchaser's breach of contract; therefore the defendant could not be liable.

Similarly here, the undisputed facts show that despite Mr. Egan's feeling that Azar was not the best firm to handle the Loyas' case, Ms. Loya was also unhappy with the representation. UMF ¶¶ 10-13, 15. Ms. Loya specifically testified that she felt communication was poor and she

was displeased with what had been accomplished in the case, and she was worried about her case given that Mr. Buttram was leaving the firm. *Id.* ¶¶ 12, 15. Regardless, even if Mr. Egan and Ms. Loya were negligent or mistaken in their assessment of the quality and extent of Azar's work, it is undisputed that a client can discharge her attorney for any reason, even without cause, and not be subject to breach of contract. *Id.* ¶¶ 13-15. Putting Mr. Egan's involvement aside, it was ultimately Ms. Loya's decision to terminate Azar because she was not happy with the firm. *Id.* ¶ 15, 22. These undisputed material facts show that Mr. Egan was not the proximate cause of Ms. Loya's decision to terminate Azar.  Azar has no evidence showing causation; therefore, Mr. Egan is entitled to summary judgment.

**II.    Mr. Egan is entitled to summary judgment on Azar's claim for prima facie tort.**

In Count II of the Complaint, Azar alleges a prima facie tort claim based on the same contentions as the intentional interference with contract claim.  Prima facie tort may not be used to circumvent the requirements and strictures of intentional interference law.  *See Fernandez-Wells v. Beauvais*, 1999-NMCA-071, ¶ 21, 127 N.M. 487, 983 P.2d 1006 ("Prima facie tort has been recognized as a cause of action for intentional torts that do not fit within the contours of commonly accepted torts.")  Mr. Egan is entitled to summary judgment dismissing Azar's prima facie tort claim because Azar has no admissible evidence sufficient to satisfy all essential elements of the claim, which are: "(1) commission of an intentional lawful act, (2) the act is conducted with intent to injure Plaintiff, (3) the act resulted in injury to Plaintiff, and (4) the act is without social or economic justification or has insufficient justification." *Beavers v. Johnson Controls World Servs. Inc.*, 1995-NMCA-070, ¶ 18, 120 N.M. 343, 901 P.2d 761.  Courts apply a balancing test, "weighing (1) the injury; (2) the culpable character of the conduct; and (3)

whether the conduct is unjustifiable under the circumstances." *Id.* ¶ 21 (citing *Schmitz v. Smentowski*, 1990-NMSC-002, ¶ 40, 109 N.M. 386, 785 P.2d 726).

The culpability of the actor's conduct is measured by looking at "(1) the nature and seriousness of the harm to the injured party . . . (3) the character of the means used by the actor and (4) the actor's motive." *Schmitz*, 1990-NMSC-002, ¶ 41 (internal quotation marks & citation omitted). "[A]n action for prima facie tort should not become a 'catch-all' alternative for every action that cannot stand on its own legs." *Beavers*, 1995-NMCA-070, ¶ 20 (citation omitted). New Mexico law is clear that to sustain a claim for prima facie tort, a plaintiff must show that the defendant intended to injure the plaintiff. *See Schmitz*, 1990-NMSC-002, ¶ 37.

The New Mexico Supreme Court has specifically rejected prima facie tort claims alleged as alternatives to contract-based claims. *See Beaudry v. Farmers Ins. Exch.*, 2018-NMSC-012, ¶ 1, 412 P.3d 1100. In *Beaudry*, the plaintiff and the defendants entered into a contract, in which the plaintiff stipulated to a provision allowing the defendants to immediately terminate the contract if the plaintiff breached it in any one of five specified ways. The plaintiff breached the contract in one of the specified ways, and the defendants terminated the contract as was their right. *Id.* ¶¶ 3-6. The plaintiff sued the defendants under numerous theories including prima facie tort and intentional interference with contract. *Id.* ¶ 3. The defendants argued that the plaintiff's prima facie tort claim should be dismissed because they "undisputedly had the right to terminate the Agreement, Plaintiff cannot demonstrate a 'legally protectable interest' in the continuation of that Agreement, as required under New Mexico law to show a legally redressable injury. Any questions as to intent to injure are, therefore, immaterial (there being no legally redressable injury)." *Id.* ¶ 7 (internal quotation marks & citation omitted). The New Mexico Supreme Court affirmed summary judgment in favor of the defendants, specifically reasoning

23

that to allow the claim to go forward would be to "sanction [the plaintiff's] evasion of the stringent requirements of his claims against Defendants for breach of contract and intentional interference with contract." *Id.* ¶ 17.

The court in *Beaudry* clarified the justification element and stated that "when the prima facie tort claim is 'closely related to an established tort,' the court should apply the privileges and defenses that would exist if the plaintiff was proceeding under the established tort claim." *Id.* ¶ 13 (citing *Restatement (Second) of Torts* § 870 cmt. j) (1979). "If an applicable privilege expresses an important policy of the law against liability that would be undermined by allowing a prima facie tort claim, then the court should generally not allow prima facie tort to proceed unless the other justification factors weigh strongly in favor of finding liability." *Id.* (internal quotation marks & citation omitted). "A judge must weigh justification against culpability to determine whether any privileges or defenses will absolve the defendant before submitting prima facie tort to the jury." *Id.* ¶ 16. "The question is whether allowing prima facie tort would undermine an important policy rationale supported by the limits on the evaded claims." *Id.* ¶ 18.

In this case, the "evaded claim" is Azar's claim for intentional interference. Allowing prima facie tort in this matter would "undermine an important policy rationale supported by the limits on" intentional interference, *id.*, because to subject Mr. Egan to liability in tort for assisting Ms. Loya in retaining new attorneys would have a chilling effect on a client's ability to freely select legal counsel of his or her own choosing. New Mexico public policy does not support such a drastic expansion of liability when it would curtail a fundamental aspect of the attorney-client relationship.

Moreover, Mr. Egan was justified in his conduct and there is no evidence of his intent to harm Azar, thus Azar cannot meet the basic elements of prima facie tort. *See Schmitz*, 1990-

NMSC-002, ¶ 37 (requiring evidence of intent to harm the plaintiff).  It is undisputed that Mr. Egan saw himself as a trusted family friend and advisor who was in the position of providing support to the Loyas as they navigated their tort matter relating to Mr. Loya's catastrophic personal injuries.  UMF ¶¶ 1-19.  Mr. Egan stood to gain nothing by Ms. Loya's termination of Azar, other than the assurance that she was in good hands. *Id.* ¶ 26. Applying the balancing test set forth in *Schmitz*, 1990-NMSC-002, ¶ 40, Mr. Egan's conduct was not culpable because there is no evidence he intended to harm Azar.  He was substantially motivated by his personal desire to help Ms. Loya and her family and ultimately Ms. Loya had an unfettered right to terminate Azar at any time, even without cause.  There is no evidence suggesting that Ms. Loya would not have discharged Azar but for Mr. Egan's involvement and advice.  Even if Mr. Egan did not like Azar and even if Mr. Egan was mistaken in his assessment of Azar's competence or the nature of its advertising, it is undisputed that he was acting out of a desire to help Ms. Loya and not to further his own personal or pecuniary interests. UMF ¶ 19. As a matter of law, there is no material evidence in support of the second and fourth elements of prima facie tort.  *See Anderson*, 477 U.S. at 249-50 ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.") (citations omitted).  Therefore, Mr. Egan is entitled to summary judgment.

## CONCLUSION

Azar has entirely failed to come forward with evidence in support of critical elements of his claims for intentional interference with contract and prima facie tort.  Mr. Egan therefore respectfully asks the Court to enter summary judgment in his favor and to dismiss Azar's Complaint in its entirety, without prejudice.

Respectfully submitted,

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

By */s/Abigail M. Yates*
    Seth L. Sparks
    Abigail M. Yates
P. O. Box 1888
Albuquerque, New Mexico 87103
Telephone:  (505) 765-5900
FAX:  (505) 768-7395
ssparks@rodey.com
ayates@rodey.com
*Attorneys for Defendant Kevin Egan*

## CERTIFICATE OF SERVICE

I hereby certify that on September 6, 2018, I filed the foregoing pleading electronically through the CM/ECF system, which caused all parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

Stephan A. Hess, Esq.
Sherman & Howard, LLC
6565 Americas Parkway NE, Suite 250
Albuquerque, NM 87110
shess@shermanhoward.com
*Attorneys for Plaintiff*

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

By */s/Abigail M. Yates*
    Abigail M. Yates

26